In the Matter of the Probate of the Will of ARNOLD W. THOMPSON, Deceased.

Surrogate's Court, Steuben County, February 14, 1948.

*Justin V. Purcell* for Edward J. Smith, proponent.

*Charles E. McManus* for William J. Thompson, respondent.

PRATT, S. Arnold W. Thompson, a second lieutenant in the United States Army, was captured on Bataan in the Philippine invasion in the early days of the war; he participated in the death march on Bataan, and subsequently was taken aboard a Japanese prison ship, which was sunk by an American bomb and he was never thereafter heard from. The United States Government notified Edward J. Smith, by telegram, dated July 23, 1945, and by confirming letter, dated July 24, 1945, that decedent was killed in action in the Pacific area December 15, 1944, while being transported aboard a Japanese vessel, which

was bombed and sunk in Subic Bay, Luzon, P. I. Thereafter an award of the Purple Heart was made on September 7, 1945, to the decedent for military merit and for wounds received in action resulting in his death December 15, 1944, and sent by the Government to Mr. and Mrs. Edward J. Smith.

The petitioner first offered for probate as the will of decedent a letter dated February 19, 1942, which was duly proved as being in the decedent's handwriting, and to have been duly transmitted through the mail and received by the petitioner, Edward J. Smith and his wife. In that letter the decedent referred to $10,000 worth of insurance, which he had been endeavoring to have made out to the petitioner and his wife, and a $75 allotment and the decedent said: "Not to appear gloomy, but if anything happens to me I want you to have everything I own". And then the decedent recited a Christmas club check, a checking account in the Post, (apparently the Painted Post Bank), some shares in the Corning Bank, which he said ought to amount to $300 or more now, three hundred pesos in the Philippine Trust Company, plus six months' base back pay, which he had not received from the army, and some money from the army for "stuff that went in Frisco Bay".

Objections were filed by the respondent alleging in detail that the letter was not executed as a will as required by section 21 of the Decedent Estate Law.

Petitioner, thereupon, filed a reply to the answer of the respondent admitting the letter was not signed by witnesses and contained no attestation clause, and alleging an abandonment during infancy by the respondent, who is the father of the decedent, and alleging that the petitioner and his wife took the decedent at the age of ten years and supported, maintained, educated and controlled him during his minority and that there was the mutual acknowledged relationship of parent and child between them, and claiming that under section 87 of the Decedent Estate Law that the respondent father was not entitled to a distributive share in the estate and therefore not an interested party in this proceeding. No proof was offered as to the allegation of abandonment contained in the reply, and that question therefor becomes academic and must be dismissed here without prejudice and not on the merits.

After testimony was taken as to the receipt of the letter by Mr. and Mrs. Smith and as to the handwriting of the decedent, the petitioner filed a supplemental petition alleging that decedent was killed in action as aforesaid and left a nuncupative last will and testament, which was executed in the year

1942, while decedent was a soldier in actual military service with the armed forces of the United States, and in which he gave and bequeathed his entire estate to the petitioner and his wife, Emma K. Smith. The respondent thereupon filed an answer denying those allegations of the petition.

. The proponent then produced two witnesses, one of whom was Cecil D. Heflin, squadron sergeant major in the army air force, who served under the decedent on Bataan when decedent was squadron adjutant, who testified that a few days after the war started all officers made out wills and that he prepared one for the decedent, and that the decedent signed and executed the will in front of three witnesses, and that in the will as he drew it decedent left everything to Mr. and Mrs. Edward J. Smith, and that the will was placed in the witness's squadron safe and kept until two or three days before the surrender on Bataan and orders were given him by decedent, as squadron adjutant, to destroy everything, and that he destroyed some twenty-six officers' wills, including decedent's, those of a few enlisted men, money and everything else in the squadron safe. The order to destroy these things came from the decedent himself. Sgt. Heflin testified further that he participated with decedent in the death march on Bataan, that he talked with the decedent several times in prison in 1942 and again in 1944, they having been in different enemy prisons in the interim, and that both in 1942 and 1944 the decedent told him again how he wanted his property left.

The proponent produced another witness, Courtney A. Forth, an employee of the Ingersoll-Rand Company, but who was working for the Honolulu Iron Works Company in the Philippines when the war started. He testified he had become acquainted with decedent while working as a student for the Ingersoll-Rand Company at Painted Post in the spring of 1940, and that he saw the decedent again Friday before war commenced in December of 1941, and that both were worried about their affairs and valuables, and the decedent told him that he wanted his property to go to Mr. and Mrs. Smith. He testified further that he saw decedent when both were prisoners at Cabanatuan in October of 1942, and that he refreshed decedent about his wishes as to his own will, and the decedent again stated to him that he wished his property to be given to Mr. and Mrs. Smith, and that decedent was then in the actual military service of the United States Government.

There are here presented then three wills all to the same effect, viz., that the decedent left his property to Edward J.

Smith and Emma K. (Mrs. Edward J.) Smith. The will executed on Bataan and destroyed before capture along with the wills of the other officers and enlisted men of the squadron, and other papers and moneys by order of the decedent as squadron adjutant, I hold was destroyed because of military necessity so that information would not get into the hands of the enemy, and was not revoked by the decedent as an intentional revocation of his will. But as to that will I also hold the proof presented does not comply with section 143 of the Surrogate's Court Act as sufficient to prove the contents of a lost or destroyed will. Only one witness testified to this will, and decedent's letter of February 19, 1942, is not sufficient to take the place of the second witness under the provisions of such section.

As to the nuncupative will, the respondent raises the point that the declaration was not made in the presence of the two witnesses when they were together, but was made on different occasions. It has long been the law that in the execution of an ordinary will it is not necessary to publish it before the attesting witnesses at the same time, but that this may be done at different times. I hold, therefore, that the nuncupative will comes in the same category, and the declaration of the same matter to two different witnesses at different times complies with the statute, and can be admitted to probate as decedent's last will and testament or used to corroborate decedent's letter of February 19, 1942. (*Matter of Miller,* 134 Misc. 671; *Matter of Mallery,* 127 Misc. 784, affd. 220 App. Div. 794, affd. 247 N. Y. 580; *Matter of Mason,* 121 Misc. 142.)

The provision for nuncupative or holographic wills for persons in actual military service was amended by chapter 688 of the Laws of 1942, effective May 6, 1942, now section 16 of the Decedent Estate Law. The propounded letter was dated February 19, 1942, at which time there was no statute regarding holographic wills as such. While, there is nothing in the amendment of 1942 to show that its provisions should have been retroactive, the letter itself complies in every respect with the, provisions of the 1942 amendment.

As to such letter dated February 19, 1942, the question of whether this statute is procedural or substantive becomes important. Holographic wills are looked upon with favor in many States and countries. In England up until 1676, and in New York State up until the codification of our laws holographic wills were valid without witnesses. In 1831, when three witnesses to a will had been required, Surrogate BRADFORD of New

York County admitted a will containing two witnesses, which was dated February 6, 1828, the statute having been changed to two witnesses before death but after the date of the will. He reasoned as follows: " Now as a will is ambulatory, and takes effect only on thè decease, it is competent for the Legislature in changing the formalities requisite to the due execution of a will to affect every instrument then executed, but which has not yet come into operation by the death of the testator. The law, therefore, wisely provided that the validity of wills already executed, should not be impaired by the new provisions of the Revised Statutes, but it stopped at that point, thus leaving to wills executed, before, the benefit of the change, so that if bad by the law existing at the time of their execution, they might be cured and become valid by the law existing at the time of the death of the testator. * * * I think, therefore, although this will was attested by only two witnesses instead of three, as required by law at the time of its execution, in order to pass real estate, that still by the decease of the testator after the Revised Statutes took effect, the defect was cured, and the will was properly admitted and recorded as a valid will of real estate by the late Surrogate." (*Lawrence* v. *Hebbard,* 1 Bradf. 252, 254.)

I consider this similar to the case at bar and that both are procedural and both statutes are to be considered as remedial. The fact section 16 of the Decedent Estate Law limits the duration of the effectiveness of such a will by a soldier or sailor in actual military service is an indication the Legislature intended to have the whole extended privilege apply during all of such service, and not merely after May 6, 1942, the effective date of the statute. I hold, therefore, that the decedent having died December 15, 1944, which was two years and a half after the effective date of the amendment to section 16 of the Decedent Estate Law, the declaration in decedent's letter of February 19, 1942, is a valid holographic will and will be admitted to probate as the last will and testament of the decedent; or it can be held corroborative of the nuncupative oral will to the same tenor.

In a Civil War case a soldier wrote his sister expressing a desire and intention, that in the event of his death, his property should be hers. After he had been wounded, he discussed this with his attendants, although they do not swear he said so. The court there held this a sufficient compliance with the statute and admitted that portion of the letter to probate as a will. (*Botsford* v. *Krake,* 1 Abb. Prac. [N. S.] 112.)

In the *Miller* case (*supra*) it was stated, " In fact, the cumulative effect of testator's separate declarations over the period of

time from April to July in 1918, all substantially alike, rather appeals to my mind with greater probative force than one single occasion would, for it indicates consistency and fixedness of intention." (*Matter of Miller,* 134 Misc. 671.)

This applies with greater force in the case at bar.

In the *Mallery* case (*supra*), the Court of Appeals held that two letters were not entitled to probate but were admissible as corroborative evidence to prove intent and they admitted the soldier's will as a nuncupative oral will on the testimony of two witnesses to conversations made at separate times of the same tenor as the letters. (*Matter of Mallery,* 247 N. Y. 580.)

The respondent contends seriously that there has been no satisfactory proof of death offered by the proponent.

In a similar case growing out of World War I during an attack on German lines where a soldier was captured and while a prisoner had a severe attack of influenza and was thereafter never heard from, it was held that this was sufficient proof of death and also that such proof is sufficient if it removes the probability of the soldier's being alive. (*Matter of Mason,* 121 Misc. 142.)

The proof of death offered and received in this case consisted of a telegram from the War Department, dated July 23, 1945, addressed to the petitioner, Edward J. Smith at his home in Painted Post as follows: "The Secretary of War deeply regrets to inform you that your friend 2/Lt Thompson Arnold W was killed in action in Pacific Area 15 Dec 44 while being transported aboard a Japanese Vessel Confirming letter follows EDWARD F. WITSELL Acting The Adjutant General of the Army."

This was followed up by a letter dated July 24, 1945, addressed to petitioner at the same address, headed, "War Department, The Adjutant General's Office, Washington 25, D. C.", confirming the telegram and giving additional facts. Also a certificate of the award of the Purple Heart given by the Secretary of War on September 7, 1945, to Second Lieutenant Arnold W. Thompson, reciting, "For military merit and for wounds received in action resulting in his death December 15, 1944," signed by the Secretary of War, and countersigned by the Acting Adjutant General was received through the United States mail by the petitioner. Petitioner also offered a certificate he received with the Purple Heart Certificate, from Harry S. Truman, President of the United States, "In grateful memory of Second Lieutenant Arnold W. Thompson, who died in the service of his Country in the Pacific Area, December 15th, 1944." These four documents were received over the objections of respondent.

The law presumes that all public officers have performed their duties and will do so in the future. (*Craft* v. *Lent,* 53 Misc. 481; *People* v. *Diamond,* 233 N. Y. 130.)

The Secretary of War, the Acting Adjutant General and the President of the United States are all high public officers. The court can take judicial notice as common knowledge of the intense effort made by such government officials to ascertain all facts with respect to the disappearance and possible deaths of members of the armed forces during wartime, and also as common knowledge when a soldier died or was wounded, of the sending of telegrams and confirmatory letters by the Adjutant General's Office, and the awarding of certificates and other meritorious awards posthumously. In this instance the court deemed that the above-mentioned documents were in accord with common official practice, and historical in effect, properly received and placed the burden on the respondent of showing that the decedent had not been killed as recited in such documents.

The respondent also contends the proponent's testimony showed that the decedent was a prisoner of war on a prison ship and if killed as claimed in Subic Bay on such prison ship that he was no more in actual military service than a civilian would be. It is well known that prisoners of war many times escape and return and ofttimes kill or wound the enemy in making such escape and no special ceremony or re-enlistment is necessary on the return of such prisoners to their commands. Section 846 of title 10 of the United States Code, relied on by respondent, does not hold to the contrary, but by providing for payment during captivity even after the expiration of the soldier's term of service indicates the soldier is at all times in actual military service. Such argument must be, therefore, brushed aside, and it is here held that this decedent as such prisoner was at all times from the date of his capture in the actual military service of the United States. Any contrary view would defeat the very purpose of section 16 of the Decedent Estate Law itself.

Surrogate McGarey of Kings County so held in *Matter of Kapp* (191 Misc. 309).

Submit decree accordingly including therein a statement of the provisions of the will as set forth in the letter of February 19, 1942, and corroborated by the statements of the witnesses Heflin and Forth as to the testamentary declaration of the decedent and such letter and declarations will be admitted to probate as the last will and testament of decedent.